# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN G. TRACEY, | CASE NO. 1:09-cv-01527-SMS |
| Plaintiff, | |
| v. | ORDER REVERSING COMMISSIONER'S DECISION AND REMANDING FOR FURTHER PROCEEDINGS |
| MICHAEL ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Sean G. Tracey, proceeding *in forma pauperis*, by his attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1] Following a review of the complete record and applicable law, this Court concludes that fact finding errors in the Administrative Law Judge's written decision go to the heart of the disability determination, requiring reversal and remand for supplemental proceedings in accordance with this decision.

///

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 10).

1

I.      **Administrative Record**

   A.      **Procedural History**

On October 10, 2006, Plaintiff filed for Title II disability insurance benefits and for supplemental security income pursuant to Title XVI, alleging disability beginning August 17, 2002. AR 169. His claims were denied initially, and upon reconsideration, on December 11, 2006. AR 169. On December 23, 2006, Plaintiff filed a timely request for a hearing. AR 169. Plaintiff appeared and testified at a hearing on March 10, 2009. AR 141-161. On March 27, 2009, Administrative Law Judge Edward C. Graham ("ALJ") denied Plaintiff's application. AR 169-176. The Appeals Council denied review on July 15, 2009. AR 1-3. On August 27, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

I.      **Agency Record**

From 1999 to 2002, Plaintiff (born June 16, 1974) worked intermittently as a pizza prep cook, janitor, motel desk clerk, garbage collector, appliance installer, grill cook, and laborer for a firewood company. On August 18, 2002, he fractured his back and right pelvis in a two-story fall from a rooftop. Physicians performed surgery, inserting plates and pins to reconstruct the pelvis and hip joint. Thereafter, Plaintiff's right leg was shorter than his left, he walked with a pronounced limp and depended on a cane, and he suffered from chronic severe pain, habituating to multiple narcotic and non-narcotic pain relievers.

In 2004, Plaintiff had seasonal work as a ski store sales clerk. He also secured a CDL Class A license to drive a truck. At various times, he delivered concrete and dropped off roll-off dumpsters. He was fired from several jobs for "blowing up at people" and getting into fights. In May 2004, he experienced a back injury at work.

On July 28, 2005, Plaintiff fell from his bicycle, suffering a right hip contusion and exacerbating his pain.

By October 31, 2005, Plaintiff's reconstructed pelvis was failing. He experienced severe pain; could not walk more than five or ten minutes, even with a cane; could not sit comfortably; was unable to sleep; and struggled with personal care, such as putting on shoes and socks.

///

1      X-rays administered to Plaintiff's back on January 24, 2006, revealed an old partial
2 compression fracture at L1, and mild disc bulges at L3-4, L4-5, and L5-S1. Radiologist John
3 Montin, M.D. diagnosed "mild spondylosis and osteoarthritis L4-5-S1 with slight disc bulges, no
4 focal disc herniation, and no significant stenosis." Right hip and pelvis x-rays showed no changes
5 since the last x-rays but suggested early arthritic changes. In or about March 2006, physicians
6 replaced Plaintiff's right hip.

7      Also in 2006, Plaintiff received treatment at Inyo County Health and Human Services for
8 emotional difficulties, including anger and anxiety. He sought help after an altercation with his
9 roommate left him homeless, explaining that he did not understand his anger episodes, which
10 frightened him. His depression was significant. He was drinking heavily and using marijuana and
11 tobacco, but was unable to acknowledge a substance abuse problem. As a child, Plaintiff's family
12 was abusive and dysfunctional. Treating records noted his pain was a contributing factor to his
13 emotional difficulties.

14      Although Plaintiff initially did well with the hip replacement, by October 2006, he was
15 suffering intractable pain. Sitting, standing, and walking produced pain so great that it was only
16 relieved when Plaintiff lay down and took ever-stronger medications.

17      Plaintiff described pain in his lower back and right hip radiating down his right leg. Only
18 hot soaks and narcotics reduced the pain. Physical examination revealed diminished tone and
19 strength in his right leg, antalgic gait,[2] dependence on his cane, decreased range of spinal motion,
20 and an inability to walk on his heels or his toes. X-rays of his right pelvis and spine revealed post-
21 surgical and post-traumatic changes.

22      In December 2006, agency physician A. Aram completed a psychiatric review technique,
23 finding no medically determinable impairment. Aram noted Plaintiff's history of anger
24 management problems and medical reports of anxiety, but no psychiatric diagnosis from an
25 acceptable source. There were no records of psychiatric hospitalizations or periods of

---

[2] Antalgic gait is an abnormality of gait in which the stance phase is abnormally shortened relative to the swing phase. It is a good indication of pain caused by weight bearing. en.wikipedia.org/wiki/Antalgic_gait (March 4, 2011).

decompensation. Records indicated Plaintiff had received high school equivalency in special education.

On December 11, 2006, S. Shifflet, M.D., a non-examining agency physician opined that Plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently; stand or walk for two hours in an eight-hour work day; and could sit up to six hours in a work day. Shifflet considered Plaintiff able to perform sedentary jobs with postural limitations. Shifflet emphasized Plaintiff's drug and alcohol problems.

In August and September 2007, Plaintiff was taking prescription morphine and undergoing physical therapy intended to produce pain relief. In November 2007, Plaintiff began treatment at a pain management facility, with treatment coordinated by Family Nurse Practitioner Sandra Spiedel.

By the end of November 2007, Plaintiff's ability to ride his bicycle had dropped from three miles daily to three miles three times per week. Certain movements produced sharp pain. His hip motion was very limited, and he limped with an antalgic gait. Pain repeatedly interrupted his sleep. A December 2007 x-ray revealed post-surgical and post-traumatic changes to Plaintiff's right hip. A lumbar spine x-ray revealed a stress fracture in Plaintiff's lower back and an old compression fracture. On January 16, 2008, Plaintiff was diagnosed with chronic pain syndrome.[3]

By the end of February 2008, although he continued to require morphine, Plaintiff's gait and muscle tone had improved, although his right leg remained weak. Spiedel noted that Plaintiff had stopped Seroquel[4] and counseling, expressing frustration with the system and reporting "scary" side effects (sleep walking and sleep eating) from the medication.

He continued to improve in March and April. By the end of April, he had resumed his regular biking routine. Records from May 28, 2008, continued to report chronic pain syndrome, and Plaintiff's right hip surgery was considered to have failed.

---

[3] Chronic pain syndrome occurs when pain continues to worsen even though the underlying injury or illness is no longer getting worse. www.emedicinehealth.com/chronic_pain/article_em.htm (March 8, 2011).

[4] Seroquel (quetiapine) is used to treat symptoms of schizophrenia ans to treat or prevent symptoms of mania or depression in patients with bipolar disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030 (March 7, 2011).

4

On July 24, 2008, Spiedel opined that Plaintiff could lift and carry up to five pounds both frequently and occasionally; could stand or walk for less than one hour in an eight-hour work day; could sit approximately three hours in a work day; and would need to lie down and rest hourly in a work day. Plaintiff could not walk continuously for more than fifteen minutes at a time. Spiedel opined that Plaintiff was unable to work.

In a letter dated August 14, 2008, Spiedel confirmed Plaintiff's participation in the pain management program, taking morphine, among other medications. She reported that Plaintiff's activities of daily living had been severely compromised and that he was unable to perform work activities.

In a progress note dated August 27, 2008, Plaintiff reported he was doing "really well" and sleeping well. He was able to do yard work and ride his bicycle. Improved pain control relieved his depression.

On September 24, 2008, Internist Sean S. To, M.D., examined Plaintiff on behalf of the agency. To neither reviewed Plaintiff's medical records nor administered any objective tests, such as x-rays. He observed that Plaintiff had a mild limp and mild difficulty getting on and off the examining table. To reported mild tenderness of Plaintiff's right hip and cervical and lumbar spine, but observed a normal range of motion and "no evidence of true nerve root damage." Considering Plaintiff to be capable of medium exertion, To opined that Plaintiff could lift up to fifty pounds occasionally and twenty pounds frequently; stand or walk for six hours of an eight-hour work day; and sit for eight hours of an eight-hour work day. According to To, Plaintiff did not require a cane to walk.

In December 2008, Plaintiff's diagnoses included chronic pain syndrome (hip, leg, and back pain), depression, and Bell's palsy. His medications included Temazepam,[5] Kadian,[6] Colase,

---

[5] Temazepam is a benzodiazepine prescribed on a short-term basis to treat insomnia. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000808 (March 7, 2011).

[6] Kadian is an extended-release capsule containing morphine sulfate used to manage moderate to severe pain that occurs around the clock and is expected to last an extended period of time. kadian.com/en/default.html (March 7, 2011).

Senekot-S,[7] and OxyIR.[8]

At the March 10, 2009 hearing, Plaintiff testified that he had last worked in 2005, doing jewelry repair. He had previously tried working at a gas station but found being on his feet all day difficult. Because of chronic pain in his back, hip, leg, and elbow, as well as mental difficulties (bipolar mood disorder), he was unable to work. Following his accident and reconstructive surgery in 2002, physical therapy and pain management had helped relieve pain, although they did not completely eliminate it. After the pelvic reconstruction failed in 2006, Plaintiff had additional reconstructive surgery and hip joint replacement. The pain, about six to seven on a scale of ten, continued. Three or four times weekly, Plaintiff experienced shooting leg pains that keep him from walking. Plaintiff controlled pain through pain management, rest and repositioning, and hot showers.

Plaintiff testified that both the pain and the pain medication impaired his ability to concentrate, causing him to lose track of what he was doing after twenty or thirty minutes. He could typically regain concentration by resting thirty minutes. When he attempted to push himself, as by moving something heavier that the five to ten pounds he was limited to lifting, he injured himself, increased his pain, and required more rest. When sitting, he needed to reposition himself every twenty to thirty minutes. Plaintiff could sit two to three hours with breaks.

Plaintiff's pain increased if he stood more than fifteen to twenty minutes at a time. He estimated that he could stand an hour or two in an eight-hour day. He could walk about eight blocks before needing a rest, but needed to rest in the course of climbing a flight of stairs.

Plaintiff could dress himself but required help to put on his shoes and socks. He could bathe himself. Because of his medications, he no longer used alcohol or illicit drugs, as he did before his 2002 fall. He could do light housework, such as making beds, washing dishes, and vacuuming, because he was able to work at his own pace and rest when necessary. He helped his wife grocery shop. He rode a comfortable, "sit-down style" bicycle, using it to pick up his nine-

---

[7] Colase and Senekot-S were prescribed to prevent constipation. AR 125.

[8] OxyIR (oxycodone) is an opiate analgesic used to treat moderate to severe pain. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589 (March 7, 2011).

6

year-old son from school.  He did not drive, worrying that the medications could cause an accident.  He enjoyed raising his son, helping with homework or going fishing.

Plaintiff testified to anger problems and difficulties getting along with others.  He was bitter and angry.  Describing a history of arguments with people that resulted in his quitting one job after another, Plaintiff thought his inability to hold any job for very long reflected his mood problems.  He was taking Seroquel to control bipolar symptoms.  Although he still had problems with anger, Plaintiff thought the medication helped.

**Vocational expert testimony.**  Gregory Stuart Jones testified as the vocational expert.  For the first hypothetical question, the ALJ directed Jones to assume a thirty-four-year-old man with a twelfth grade education who can perform light work.  The hypothetical person can stand or walk six out of eight hours; sit six out of eight hours; and occasionally climb, balance, stoop, kneel, crouch, and crawl.  He is mild to moderately limited in understanding and remembering tasks or in sustained concentration or persistence; in socially interacting with the general public, and in adapting to workplace changes.  He has slight to moderate to marked mental limitations.

Jones replied that such a person could work as a general cashier (DOT No. 211.462-010), level 2, light and unskilled work with 300,000 jobs in the national economy and 12,000 jobs in the local economy; a fast food worker (DOT No. 311.472-010), level 2, light and unskilled work with 100,000 jobs in the national economy and 6000 in the local economy; or a cafeteria attendant (DOT No. 311.677-010), level 2, light and unskilled work, with 40,000 jobs in the national economy and 2000 in the regional economy.

Such a person could also perform sedentary jobs including telephone information clerk (DOT No. 237.367-046), sedentary and unskilled, level 2, with 30,000 jobs in the national economy and 1500 in the regional economy; addressing clerk (DOT No. 209.587-010), sedentary and unskilled, level 2, with 40,000 jobs in the national economy and 1500 in the regional economy; or food and beverage order clerk (DOT No. 209.567-014), sedentary and unskilled, level 2, with 12,000 jobs in the national economy and 1000 in the regional economy.

For the second hypothetical question, the ALJ asked whether the individual could perform the listed jobs if he had marked mental limitations.  Jones answered, "No."

1  For the third hypothetical question, the ALJ asked whether an individual could perform the
2  listed jobs on a full time basis if he could stand or walk from one to two hours out of eight hours,
3  and sit two to three hours out of eight hours.  Again, Jones answered, "No."

## II.     Discussion

### A.     Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:    Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:   Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:   Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 17, 2002.  AR 174.  Plaintiff's severe impairment was status post

right hip replacement and mood disorder, NOS.  AR 174.  His impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  AR 175.  Plaintiff had no past relevant work.  AR 175.  Plaintiff had the residual functional capacity to perform light work, as defined in 20 C.F.R. §404.1567 (b).  AR 175.  After considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that jobs that Plaintiff could perform existed in the national economy in significant numbers.  AR 175.

### B. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.

### C. Did the ALJ Err in Assessing Plaintiff's Residual Functional Capacity?

At step five of the disability analysis, the Commissioner bears the burden of proving that the claimant has the residual functional capacity to perform other work.  If the claimant has that

///

9

capacity, he or she is not disabled. If the claimant lacks the residual functional capacity to work, he or she is disabled. *Lester*, 81 F.3d at 828 n. 5.

Plaintiff maintains that the Commissioner erred in assessing his residual functional capacity in that he misstated or overlooked facts in the record, and rejected the opinions of Spiedel, the Nurse Practitioner providing long-term pain management to Plaintiff, in favor of the opinion of Dr. To, an internist who examined Plaintiff but neither reviewed Plaintiff's medical records nor administered or reviewed any objective tests or measures. The Commissioner responds that the ALJ properly evaluated the opinions of Spiedel, To, and Schifflet, and that substantial evidence supported his decision.

This Court's task is not to re-weigh the evidence but to determine whether the ALJ's determination is supported by substantial evidence and free of legal error. The Court must review the ALJ's express reason(s) for rejecting Spiedel's opinion and determine whether the rejection was specific and legitimate. Having done so, this Court concludes that the determination was neither supported by substantial evidence nor free of legal error.

**Unsupported Fact Finding.** The ALJ's fact finding displayed breathtaking inaccuracies. For example, in direct contradiction of facts in the record, the ALJ stated:

> The claimant has not recently been referred to a pain clinic and there is no evidence that he uses home remedies such as a heating pad, hot water bottle, or hot baths for relief. Therefore, it is reasonable to assume that his pain is not as severe or limiting as he alleged.

AR 172.

As Plaintiff points out, multiple references within the record address Plaintiff's use of home remedies, including his use of heat and hot water to relieve pain. More importantly, the ALJ's failure to identify Plaintiff's chronic pain syndrome and resulting referral to and treatment by the pain management clinic are fatal to the Commissioner's denial of disability benefits to Plaintiff.

"If the claimant experienced the pain and limitations claimed, it is reasonable to assume that he would have sought out treatment modalities which alleviate severe and unremitting pain," the ALJ wrote. AR 172. And later, the ALJ stated, "The claimant has not recently been referred

to a pain clinic." AR 172.  A cursory review of the record would clearly have indicated Plaintiff's ongoing pain clinic treatment.  Accurate fact finding and appropriate legal analysis are required to determine Plaintiff's residual functional capacity.

**Analysis of Expert Opinion.**  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Benecke v. Barnhart*, 379 F.3d 587, 592 (9th Cir. 2004); *Lester*, 81 F.3d at 830.  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

A nurse practitioner such as Spiedel is not recognized as an acceptable medical source.  20 C.F.R. § 404.1513(a).  Nonetheless, the Commissioner may consider evidence of the severity of a claimant's impairments and the effect on a claimant's ability to work from other sources, including nurse practitioners.  20 C.F.R. § 404.1513(d).  Indeed, when the clinical notes or other materials attributable to a nurse practitioner or similar source compose a significant portion of the record, that evidence constitutes significant and probative evidence that the ALJ must consider. *See Wick v. Astrue*, 2009 WL 2393106 at *9 (D.Or. July 31, 2009) (Civil No. 08-6108-MO).  *Cf.*, *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).  Opinions from other sources are accorded less weight than that accorded the opinion of a physician or other accepted source. *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).  Nonetheless, the opinions of nurse practitioners regarding the effects of impairments on a claimant's ability to work must be considered and the weight given to those opinions must be explained.  20 C.F.R. § 404.1513(d); 416.913(d); SSR 06-03p.  Because the ALJ failed to recognize that Spiedel was a

///

nurse practitioner, referring to her as "Dr. Spiedel," however, her status as a nurse practitioner did not factor in his analysis.

In SSR 06-03p, "the Social Security Administration recognized the growth of managed health care in this country and the increased reliance on 'other medical sources,' such as nurse practitioners and physician assistants for treatment and evaluation functions previously handled by medical doctors and licensed psychologists." *Reynolds v. Astrue*, 2010 WL 3516895 at *8 (E.D.Wash. September 3, 2010) (No. CV-09-0213-CI), *quoting* SSR 06-03p. In addition, reliance on paraprofessionals such as nurse practitioners may be greater in rural or other areas of low population, such as Lone Pine, California, in Southern Inyo County, where Spiedel oversaw Plaintiff's long-term treatment. The Commissioner's ruling provided that adjudicators could give the opinions of "other medical sources" more weight than opinions of physicians based on how often the other source had seen the individual and if the other source's opinion has better supporting evidence than the opinion of the acceptable medical source. *Reynolds*, 2010 WL 3516895 at *8.

Accordingly, even though Spiedel is a nurse practitioner, the ALJ was required to consider her opinions as to how Plaintiff's impairments affected his functional ability. *Id.* at *9. To reject Spiedel's opinions, the ALJ was required to set forth reasoning specific and germane to Spiedel. *Id.*; *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d). Applying these factors would be favorable in a specific and germane assessment of Spiedel's opinion, who had examined and treated Plaintiff in accordance with his treating orthopedist's referral; provided records of her ongoing treatment of Plaintiff; and devoted her practice solely to pain management.

In addition, the ALJ rejected "Dr. Spiedel's" opinions as not being supported by the objective findings or the record as a whole. By definition, chronic pain syndrome arises when a

patient's pain increases even though the physical injury or ailment that is the genesis of the pain has stabilized. "Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; e.g., someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis." 20 C.F.R. § 404.1545(e).  In light of the ALJ's unsupported and erroneous fact findings, the Commissioner must provide a more careful analysis of the extent of Plaintiff's excess pain and its result on his residual functional capacity on remand.

**Dr. To.**  The ALJ acknowledged the conclusions of a medical consultant, internist Dr. Sean To, who performed "an Independent Internal Evaluation of the claimant, " but rejected To's conclusions of Plaintiff's remaining physical abilities, "noting that the claimant had total hip replacement."  AR 172.  Accordingly, the ALJ found that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; could stand and walk for six hours in an eight-hour work day; could sit six hours in an eight-hour work day; and could occasionally climb, balance, stoop, kneel, crouch, and crawl.  The ALJ provides no basis for his conclusion.

On remand, Plaintiff's residual functional capacity must be based on something more than the ALJ's subjective belief as to what a person with a hip replacement ought to be able to do.  If the evidence is inadequate or ambiguous, the ALJ has a duty to develop the record sufficiently to allow proper assessment of the claimant's residual functional capacity. *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  To the extent that the Commissioner determines on remand that the evidence in this case is unreliable or incredible, the agency may be required to obtain additional information by contacting treating physicians, specifically including those who referred Plaintiff to Spiedel for pain management; scheduling further consultative examinations, possibly with physicians having expertise with orthopedic and chronic pain issues; or securing the opinion of a medical expert.  *See* 20 C.F.R. §404.1512(d)-(f). *See also Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); *Armstrong v.*

13

*Commissioner of Social Security Admin.*, 160 F.3d 587, 590 (9th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

**Date of Disability, if any.**  Plaintiff properly points out that Schifflet's opinion, prepared before Plaintiff developed chronic pain syndrome, is stale.  To the extent that the Commissioner determines on remand that Plaintiff was disabled for all or part of the time elapsed since the alleged date of onset, Schifflet's opinion may be relevant to the determination of the dates of disability.

**III.    Conclusion and Order**

"The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In social security cases, the decision to remand to the Commissioner to award benefits is within the court's discretion.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.

Accordingly, this Court orders that the administrative determination be REMANDED for development of an adequate record relating to the consequences of Plaintiff's orthopedic impairments and chronic pain on his residual functional capacity and rehearing in light of that record.  The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Sean G. Tracey and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:    March 14, 2011**              /s/ Sandra M. Snyder
                                           UNITED STATES MAGISTRATE JUDGE